[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-13276
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 4, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 08-00053-CR-1-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GLORIA JEAN MARTINEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 4, 2010)

Before BLACK, HULL and PRYOR, Circuit Judges.

PER CURIAM:

After pleading guilty, Gloria Jean Martinez appeals her conviction and 45-

month sentence for encouraging aliens to enter and reside in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).  After review, we affirm.

## I.  BACKGROUND

**A.    Offense Conduct**

In 2007, Martinez operated a business helping illegal aliens obtain drivers licenses or other identification.  Martinez provided the illegal aliens with the necessary documentation, which was fraudulent, and took them to Georgia driver's license service centers, where she helped them complete forms.  The fraudulent documents Martinez gave the illegal aliens included lease agreements and utility bills, used to show proof of Georgia residency.  Martinez prepared lease agreements falsely stating that she was the aliens' landlord and took them to a woman named Hayla, who certified approximately 100 lease agreements for Martinez.  Martinez also provided the aliens with authentic birth certificates and social security cards she purchased from others.

Martinez advertized her services and charged fees ranging between $40 and $500.  Martinez recruited Fannie Sue Young and Brandie Gaydon to help drive illegal aliens to the service centers.  Young drove aliens three or four times and Gaydon drove aliens about ten times.

During a search of Martinez's residence, investigators found a ledger

containing a list of 176 individuals.  Thirty of the names in the ledger had purchased lease agreements or other documents from Martinez.  Investigators located and arrested ten of these thirty people.  Six of the arrested people, all of whom were illegal aliens, admitted that Martinez had helped them by giving them fraudulent lease agreements and taking them to the service centers to obtain identification.  Martinez admitted to investigators that she knew at least 35 of the people she had helped were illegal aliens.

**B.     Indictment and Guilty Plea Colloquy**

A federal grand jury indicted Martinez and her codefendant, Fannie Sue Young, for encouraging and inducing five aliens "to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was in violation of law," in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).  Martinez agreed to plead guilty and tendered her plea before a magistrate judge.

During her plea hearing, the magistrate judge placed Martinez under oath.  To ensure that her plea was voluntary, the magistrate judge elicited information from Martinez regarding her mental and physical health.  At the time of the hearing, Martinez was 61 years old, had graduated from Interactive College, and verified that she could read and write.  Martinez swore that she had never been

treated for a mental illness or substance abuse, and that she did not suffer from any mental or emotional disability. She added that none of her daily medications affected her ability to think or reason.

Martinez acknowledged that she: (1) had received a copy of the indictment and understood the charge against her; (2) had discussed the charge with her counsel; and (3) was satisfied with her counsel's representation. The magistrate judge ensured that Martinez had not: (1) received any promises to persuade her to plead guilty; or (2) been threatened or coerced to plead guilty. Martinez confirmed that she was pleading guilty of her own free will. Martinez understood that she had the right to plead not guilty and that entering a guilty plea would waive her right to: (1) a speedy and public jury trial; (2) representation by counsel, including court-appointed counsel, at every stage of the proceedings; (3) require that the government prove beyond a reasonable doubt that she is guilty of the charged offense; (4) confront the government's witnesses; (5) testify; (6) present evidence; and (7) call her own witnesses and compel them to testify. Martinez acknowledged that her guilty plea would waive her right against compelled self-incrimination.

The government informed Martinez of the elements of her offense, that she had "encouraged or induced an alien to reside in the United States knowing and

4

with reckless disregard that that alien's coming to, entry, or residence in the United States would be a violation of US law." The government explained that no mandatory minimum sentence applied, and that the maximum possible penalty was 10 years' imprisonment, 5 years of probation, 3 years of supervised release, a $250,000 fine, and a $100 special assessment. Martinez stated that she understood "some" of the possible consequences of her guilty plea. The magistrate judge responded that she would ensure that Martinez understood all of the consequences, and asked whether Martinez had any questions.

At this point, Martinez's counsel stated that he could communicate well with Martinez when he spoke slowly and used "inflection to assist in cognitive processing." Defense counsel thought that Martinez had not understood the government's explanation of the penalties. The magistrate judge repeated the potential sentence, and Martinez stated that she understood. The magistrate judge asked whether Martinez had any questions, and Martinez responded: "I understand it more better." The magistrate judge asked Martinez's counsel to ensure that she understood. Counsel conferred with Martinez and informed the magistrate judge that he believed that Martinez understood. Defense counsel noted that his earlier concern stemmed from the fact that Martinez may answer "yes" to a question "because leaving a question hanging in the air is uncomfortable." However,

5

defense counsel had asked Martinez questions regarding the potential sentence, and she had answered them correctly. Martinez informed the magistrate judge that she understood. Martinez agreed that she would not answer "yes" to a question she did not understand.

The magistrate judge explained that the district court could impose the maximum sentence upon Martinez, and that the court could sentence her exactly as it would have had she proceeded to trial. Martinez initially stated that she understood, but then said: "I kinda understand. I kinda do and I don't." The magistrate judge reiterated that: (1) Martinez did not have to plead guilty and could proceed to trial instead; and (2) the court could impose the same sentence regardless of whether she proceeded to trial or pled guilty. Martinez then stated that she understood. Martinez also understood the applicability of the advisory guidelines to her case, including that the court may sentence her above or below her guidelines range.

The government presented the factual basis for the plea. From approximately September 2007 to July 12, 2008, Martinez, aided and abetted by Young, drove many people to the Georgia Department of Driver Services ("DDS"), including the five individuals listed in the indictment. At the DDS, Martinez provided the individuals with lease agreements that indicated that they

6

were Georgia residents. The individuals also presented birth certificates and/or social security cards indicating that they were United States citizens. Martinez assisted the individuals with completing the necessary forms to obtain a Georgia identification card. The forms indicated that the individuals were United States citizens, although they were not.

The government conceded that it was unclear whether Martinez provided all the documents, but noted that she received payment for providing some documents. The government pointed out that one individual paid $600 to Martinez, and this individual informed the government that Martinez advertised her services in a grocery store. The government stated that Martinez knew that the individuals listed in the indictment were illegal aliens. Martinez also admitted to assisting over 100 people obtain documentation, 35 of whom she knew were illegal aliens. And, a search of Martinez's residence revealed a ledger in which she listed 170 names and noted how much each person had paid her, and what type of documentation she obtained for them. Martinez acknowledged that the government presented an accurate description of her conduct.

When the magistrate judge asked about the sufficiency of the plea colloquy, Martinez's counsel stated that the magistrate judge did not need to ask Martinez any additional questions before accepting her plea. The magistrate judge then

7

asked "is there any reason you know of, based on capacity or any other basis, why I should not recommend that her guilty plea be accepted?" Martinez's counsel stated that it was appropriate to accept Martinez's guilty plea, noting that:

> I know that we've struggled through this plea hearing a little bit and I know that . . . Jean [Martinez] has some problems understanding things sometimes. But I don't think that there is a failing of her expression or her desire to admit to the charge in this indictment and to the conduct which has been described by the Government. So I think we're okay.

The magistrate judge asked whether Martinez had any questions, and, when Martinez did not respond, Martinez and her counsel conferred off the record. Counsel then expressed concern that Martinez did not actually know some of the people that the government stated that she helped. The magistrate judge allowed a recess, but noted that she was not concerned with whether Martinez knew the names of the people, but with whether she acknowledged her conduct with respect to those people.

After a thirty minute recess, Martinez's counsel explained that, when the magistrate judge asked if she had any questions, Martinez informed counsel that she denied some of the offense conduct recited by the government. Counsel noted that, during the recess, he discussed the offense with Martinez, but that she "was not answering questions today to me that she had easily answered in the past, and I felt like it was almost as if we were meeting for the first time. I really had some

8

concerns about that." However, counsel stated that reviewing the offense conduct with Martinez refreshed her recollection, and that Martinez then explained the conduct in her own words in a way that mirrored the government's recitation. Counsel then stated: "So I think everything's okay now."

Counsel further noted that Martinez explained that she did not wish to deny the offense conduct, but that she wanted to clarify that she did not know the people in the indictment prior to taking them to the DDS, and that she did not prepare a fraudulent lease for each one of them. Counsel stated that he was "satisfied again that she does want to plead guilty today to the offense conduct." Defense counsel stated that Martinez agreed that the government's recitation of her conduct was correct. Martinez then acknowledged that her counsel accurately stated her position, and she admitted to the conduct that the government described in support of the guilty plea. Martinez stated that she did not have any questions, and entered a guilty plea. Martinez confirmed that her plea was made freely and voluntarily, and that she was guilty.

The magistrate judge found that Martinez was "fully competent and capable of entering an informed plea, that she's aware of the nature of the charge and the consequences of the plea, that her plea of guilty is made knowingly and voluntarily and that it is supported by an independent basis in fact establishing the elements of

9

the charge to which she has pled guilty." The magistrate judge prepared a report ("R&R") recommending that the district court accept the guilty plea. Martinez did not object to the R&R. The district court accepted the plea and adjudicated Martinez guilty.

## C.    Presentence Investigation Report

The presentence investigation report ("PSI") recommended a base offense level of 12, pursuant to U.S.S.G. § 2L1.1(a)(3), and added 6 points, pursuant to U.S.S.G. § 2L1.1(b)(2)(B), because the offense involved the smuggling, transporting, or harboring of between 25 and 99 unlawful aliens. The PSI explained that, although Martinez listed 176 individuals in the ledger in her residence, it could not be determined whether any single alien had multiple documents certified. Thus, the PSI concluded that it could not be assumed that 100 documents represented 100 aliens. The PSI also: (1) added two levels, pursuant to U.S.S.G. § 2L1.1(b)(3)(A), because Martinez committed any part of the offense after being convicted of a prior felony immigration and naturalization offense; (2) added two levels, pursuant to U.S.S.G. § 3B1.1(c), because Martinez was the organizer/leader of the organization, as she advertised and recruited participants from area stores and recruited drivers to facilitate the offense; (3) subtracted three levels for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b).

With a total offense level of 19 and a criminal history category of I, the PSI recommended an advisory guidelines range of 30 to 37 months' imprisonment.

The PSI stated that Martinez had significant health problems, including numerous strokes caused by an active brain aneurysm, high blood pressure, and poor circulation. Martinez was borderline diabetic, had weakness on her left side and was taking fifteen medications. Martinez recently was hospitalized for a week and underwent an angioplasty procedure. Due to her health problems, Martinez was not able to work for the last thirteen years.

According to the PSI, Martinez indicated that she never had any mental health problems, but while she was hospitalized she saw a psychiatrist and was prescribed an anti-depressant, which helped her sleep. Neither Martinez nor the government filed objections to the PSI.

**D.    Sentencing**

On May 18, 2008, Martinez did not attend the first sentencing hearing because she was hospitalized "with stroke-like symptoms" the night before. Her counsel stated that Martinez had "a very extensive medical background," which included at least eleven strokes within the "last couple of years." Counsel explained that Martinez's physician planned to do an MRI on Martinez's head. Counsel also contended that Martinez was diabetic. The district court continued

the sentencing, but ordered counsel to provide documentation of Martinez's

hospitalization and prognosis.[1]

On June 17, 2009, the district held a second sentencing hearing, which

Martinez attended. Neither Martinez nor the government raised any objections to

the PSI. The district court found that Martinez had a total offense level of 19 and a

criminal history category of I, which yielded an advisory guidelines range of 30 to

37 months' imprisonment.

Although Martinez's counsel agreed with the PSI and the guidelines

calculations, he asked the district court to postpone sentencing. Defense counsel

informed the district court that he had received Martinez's medical records on the

day of the sentencing hearing and discovered that she had a documented history of

cerebral ischemia, which can impair judgment and decision-making ability.

Defense counsel stated that he had "a grave concern" that he had "not more

aggressively pursued a mental health evaluation" for Martinez "to determine

whether or not these medical conditions . . . would somewhat explain . . . though

---

[1]Defense counsel later submitted a May 20, 2009 letter from Martinez's physician stating that Martinez was admitted to the hospital on May 17, 2009 "with a diagnosis of right hemi paresis," that her condition was guarded and her estimated release was unknown pending a neurosurgeon's evaluation. On June 5, 2009, defense counsel notified the district court that Martinez had been discharged from the hospital on May 22, 2009, and transferred to a short-term disability care facility "in connection with a cerebral-vascular accident (CVA)." Defense counsel submitted a June 3, 2009 letter from Martinez's doctor stating that Martinez was admitted to the facility for "short term rehab following a CVA with right sided weakness." The doctor stated that Martinez's condition was stable and her prognosis was good. The doctor anticipated Martinez would be released on June 5, 2009.

not excuse, her conduct in this case."  Defense counsel explained that, prior to receiving the records, he had planned to focus his defense at sentencing on her poverty and other medical issues, such as degenerative spinal disease.  Defense counsel previously attributed Martinez's criminal conduct to her poverty, but he now believed that Martinez had "organic brain disease explanations for her conduct that [he] ha[d] not investigated."

The government opposed a continuance, arguing, in pertinent part, that Martinez had a history of fraudulent conduct going back to 1971, which suggested that her offense conduct was not caused by recent medical conditions.  The district court denied defense counsel's request for a continuance, noting that Martinez's medical issues were not new.  The court pointed out that one month had elapsed since the original sentencing hearing in which the court ordered Martinez's counsel to produce Martinez's medical records, and that the documentation submitted to date was "sketchy."  The court told Martinez's counsel:

> So the information was available to at least alert you, if there was going to be an alert, and the fact that [Martinez] may have just brought to you today more detailed information is irresponsible maybe on her part, but I don't see any need for continuing this case.  This case has been lingering.  All of the other people growing out of it have long since been sentenced and disposed of and probably are no longer even in this country because of this conduct.

The district court further noted that Martinez had committed a similar felony

13

immigration offense approximately twenty years earlier, and that she had committed similar offenses before that as well.[2]  The district court found that nothing in Martinez's case or medical reports would serve as a defense.  Thus, the court denied Martinez's motion to continue sentencing.

In mitigation, Martinez stressed her age and serious health conditions and argued that a sentence within the advisory guidelines range would be "a death sentence."  Defense counsel stated that Martinez has trouble remembering to take her medication or pay her bills.  When the probation officer tried to take a social history, Martinez could recall only four of her seven marriages and could not explain how she got the surname "Martinez."  Defense counsel pointed out that Martinez's 20-year-old federal conviction for supplying false documents to aliens was so old it did not count in the criminal history computation and that the instant offense and Martinez's past criminal offenses were motivated by her extreme

---

[2]According to the PSI, between 1971 and 1973, Martinez had three misdemeanor convictions for writing insufficient funds checks.  In 1979, Martinez pled guilty to filing a false police report and was sentenced to six months' probation.  In 1992, Martinez was convicted of additional misdemeanor insufficient funds check offenses.  In 1996 and again in 1998, Martinez was accused of causing an over-issuance of food stamps and public assistance.  Both state court cases settled, with Martinez agreeing to repay the money and to be disqualified from receiving program benefits for a period of time.

Most significantly, in 1988, Martinez pled guilty in federal court to two counts of supplying false documents used in making applications to the Immigration and Naturalization Service ("INS"), in violation of 8 U.S.C. § 1160(b)(7)(A)(ii), and was sentenced to twelve months' imprisonment. During this offense, Martinez sold fraudulent documents to aliens so they could apply for benefits under the Special Agricultural Worker provisions of the Immigration Reform Act of 1986.  Judge William C. O'Kelley, who presided over Martinez's 1989 sentencing, also presided over her sentencing for the current offense.

poverty. Martinez requested a 12-month sentence. Based on the circumstances of the offense and Martinez's criminal history, the government requested a sentence at the middle or the high end of the advisory guidelines range.

Noting that it had considered the 18 U.S.C. § 3553(a) factors and the advisory guidelines range, the district court imposed a 45-month sentence. The district court described Martinez's case as "disturbing," and stated that it believed her "health problems are overly magnified." The court noted that, even if Martinez's medical problems were severe, she was still able to violate the law while suffering from them. The court stated its view that "just because you are sick or ill doesn't mean you have impunity to go out and violate the law without being punished." The court stressed that several prisons have medical facilities for inmates who need medical attention.

The district court acknowledged that most of Martinez's prior offenses were more than ten years old, but explained that the convictions were significant because they involved similar offenses and suggested Martinez had not changed her conduct. The court found that Martinez's current offense was "worse than the guidelines indicate," citing the following aggravating facts: (1) Martinez advertised her services, which was inconsistent with arguments that she had a diminished mental capacity; and (2) the illegal aliens for whom she provided documents had

15

no prior criminal history, but, because of Martinez's actions, spent time in jail and some were deported. The district court stressed the importance of punishing Martinez, deterring her and others from committing this type of offense, and protecting society from Martinez. The court noted that Martinez's prior one-year sentence for a similar immigration offense had not deterred her from committing the instant offense. Martinez filed this appeal.

## II. DISCUSSION

### A. Motion to Continue Second Sentencing Hearing

Martinez argues that the district court should have granted her request to continue the second sentencing hearing so that her attorney could investigate her cerebral ischemia.

We review for abuse of discretion the district court's denial of a request to continue sentencing. United States v. Lee, 427 F.3d 881, 896 (11th Cir. 2005). We consider the denial of a motion for a continuance "in light of the circumstances presented, focusing upon the reasons for the continuance offered to the trial court when the request was denied." United States v. Knowles, 66 F.3d 1146, 1160-1161 (11th Cir. 1995). A defendant bears the burden of showing that the denial "produced specific substantial prejudice." United States v. Smith, 757 F.2d 1161, 1166 (11th Cir. 1985).

16

Martinez's counsel requested the continuance to pursue a mental health evaluation to determine whether Martinez's cerebral ischemia could explain, if not excuse, her offense conduct. Defense counsel explained that he was prepared to focus on Martinez's physical condition and extreme poverty as mitigating evidence at the sentencing hearing, but, based on the newly obtained medical records, wanted to explore whether her mental condition might also be a mitigating factor in sentencing. Contrary to Martinez's claims on appeal, her counsel did not question Martinez's mental capacity to understand the plea colloquy or her competency to enter her guilty plea. Nor did defense counsel request time to determine whether to file a motion to withdraw Martinez's guilty plea.

Further, although Martinez's counsel may not have been aware of the cerebral ischemia diagnosis, he was aware of Martinez's illnesses, including her multiple hospitalizations for stroke-like symptoms, well before the second sentencing hearing. In fact, defense counsel was aware Martinez was having some memory problems and cognitive difficulties at the time of her March 3, 2009 plea and during her interview with the probation officer prior to preparation of the April 2, 2009 PSI. Yet, during this two-month period, defense counsel did not seek to have Martinez's mental health evaluated. Indeed, at the plea hearing, defense counsel repeatedly told the magistrate judge that Martinez was able to understand

17

the proceedings.[3]

Moreover, this was Martinez's second request to continue the sentencing. The district court already had granted one continuance on May 18, 2008, while Martinez was hospitalized with more stroke-like symptoms and then underwent short-term rehabilitation. This continuance gave Martinez an additional month to gather medical evidence to present in mitigation. In denying Martinez's requested continuance, the district court noted that the proceedings had gone on too long and that the other defendants connected with Martinez's case already had been sentenced.

Finally, Martinez to date has not presented any evidence that a mental health evaluation would have affected the outcome of her sentencing. The district court concluded that it had seen nothing in Martinez's medical records that "would have served [as] a defense to this matter." In other words, the district court did not think

---

[3]Without raising it as a separate ground for reversal, Martinez suggests that her behavior during her plea hearing raises questions as to whether the magistrate judge should have sua sponte ordered a competency hearing or whether Martinez's plea was knowing and voluntary. We disagree. The record does not reflect that a "bona fide doubt" existed regarding Martinez's competence to enter a guilty plea. See Tiller v. Esposito, 911 F.2d 575, 576 (11th Cir. 1990); see 18 U.S.C. § 4241(a). And, the magistrate judge did not abuse her discretion in failing to sua sponte order a competency hearing.

As to the voluntariness of Martinez's plea, our review of the record indicates that the magistrate judge took great care during the plea hearing to ensure that Martinez understood the nature of the charge and the consequences of pleading guilty, that Martinez's plea was voluntary and that Martinez was in fact guilty of the charged offense. In any event, Martinez did not object to the magistrate judge's recommendation that the plea was knowing and voluntary, thus waiving appellate review of this potential claim. See Fed. R. Crim. P. 59(b)(2).

18

additional time to pursue a mental health evaluation as mitigation evidence was warranted. Thus, Martinez has not shown specific, substantial prejudice. In light of the circumstances presented and the reason givens for the requested continuance, we cannot say the district court abused its discretion.

## B.    Reasonableness

Martinez argues that her 45-month sentence is procedurally and substantively unreasonable.

We review the reasonableness of a sentence for abuse of discretion using a two-step process. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively reasonable under the totality of the circumstances and in light of the 18 U.S.C. § 3553(a) factors. Id.[4] The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors. United States v. Thomas, 446 F.3d 1348, 1351 (11th Cir. 2006).

_____

[4]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

19

"If, after correctly calculating the guidelines range, a district court decides that a sentence outside that range is appropriate, it must 'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 50, 128 S. Ct. 586, 597 (2007)). Likewise, although "[s]entences outside the guidelines are not presumed to be unreasonable, . . . we may take the extent of any variance into our calculus." United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir.), cert. denied, 129 S. Ct. 2847 (2009). However, we "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Gall, 552 U.S. at 51, 128 S. Ct. at 597.

Martinez raises several alleged procedural errors, none of which has merit. The district court correctly calculated Martinez's advisory guidelines range using U.S.S.G. § 2L1.1(a)(3) to determine her base offense level and imposing a six-level enhancement under U.S.S.G. § 2L1.1(b)(2)(B) based on the number of aliens Martinez assisted. The district court did not treat the guidelines as mandatory and conducted an individual assessment of the facts and circumstances of Martinez's case in deciding to impose a sentence eight months above the advisory guidelines range. The fact that under the 18 U.S.C. § 3553(a) factors the district court

20

considered circumstances that also played a role in the calculation of Martinez's

advisory guidelines range does not make her sentence unreasonable. See United

States v. Amedeo, 487 F.3d 823, 833-34 (11th Cir. 2007) (rejecting argument that

district court could not consider under the § 3553(a) factors conduct used to

impose guidelines enhancement).

Martinez also argues that the district court failed to provide written reasons

for imposing an eight-month upward variance.[5]  Under 18 U.S.C. § 3553(c), the

district court must state in open court the reason it has imposed the chosen sentence

and, if the sentence is outside the advisory guidelines range, the court must state

the specific reason for the variance. See 18 U.S.C. § 3553(c)(2).  In addition, the

district court's reason for a variance "must also be stated with specificity in the

written order of judgment and commitment . . . ." Id.

Here, the district court explained in open court its reason for imposing a

---

[5]Contrary to Martinez's assertions, the district court did not impose an upward departure under U.S.S.G. § 4A1.3 for under-represented criminal history.  Instead, the district court imposed an upward variance after considering the § 3553(a) factors. See United States v. Irizarry, 458 F.3d 1208, 1211-12 (11th Cir. 2006), aff'd, Irizarry v. United States, ___ U.S. ___, 128 S. Ct. 2198 (2008) (explaining that district court's sentence above the guidelines range was the result of an upward variance and not an upward departure where the district court calculated the advisory guidelines range, considered the § 3553(a) factors and concluded that a sentence within the guidelines range did not adequately address the defendant's future dangerousness); United States v. Eldick, 443 F.3d 783, 788 n.2 (11th Cir. 2006) (holding that the district court imposed a variance when it imposed a sentence above the defendant's guideline range, but did not cite to a specific guideline provision and stated that the guidelines did "not adequately take into account the severity of the damage" of the defendant's offense).  Thus, Martinez's argument that written reasons were required by U.S.S.G. § 4A1.3 is without merit.

21

sentence above the advisory guidelines range. Specifically, the district court stated that Martinez's offense was worse than the guidelines range indicated because Martinez advertised her services and lured in illegal aliens who had no other criminal history and who were imprisoned and deported as a result of Martinez's conduct. The district court also noted that Martinez's past one-year sentence for a similar immigration-related offense had not deterred her. Thus, the district court based the upward variance on the need to punish Martinez, deter her and others from committing this type of offense and protect society from Martinez.

Although the district court gave a detailed explanation of its reasons for a sentence above the advisory guidelines range, the district court did not include a written statement of those reasons in its judgment. We conclude, however, that any error in failing to comply with § 3553(c)(2) does not warrant reversal.[6] The specific reasons for the upward variance the district court gave Martinez at the sentencing hearing were sufficient to permit Martinez to challenge the upward variance on appeal. Thus, we do not see how Martinez was harmed by the

_____

[6]We have concluded that we review de novo whether a district court has complied with § 3553(c)(1) even when the error is raised for the first time on appeal. See United States v. Williams, 438 F.3d 1272, 1274 (11th Cir. 2006). However, we have not addressed in a published opinion whether plain or preserved error review applies when a defendant fails to raise a § 3553(c)(2) error in the district court. We need not resolve this issue because we conclude there is no reversible error under either standard of review.

22

omission.

Martinez also has not met her burden to show that her 45-month sentence, only 8 months above the advisory guidelines range of 30 to 37 months, was substantively unreasonable. Although the convictions in Martinez's criminal history were more than ten years old, they do evince a pattern of fraudulent activity. And, we agree with the district court and the government that Martinez's current offense prayed on vulnerable illegal aliens and did "wreak havoc" in their lives. Thus, although these illegal aliens were not lawfully in the United States, they were in a way victims of Martinez's fraudulent activity. Furthermore, Martinez already had served a one-year sentence for selling fraudulent documents to illegal aliens in a similar offense. Nonetheless, Martinez was willing to engage in this kind of activity again, suggesting that a stiffer sentence was needed the second time around to punish and deter Martinez and protect society from her.

Finally, we disagree that Martinez's decision to advertise her services showed her "lack of sophistication and obliviousness to the fact that her conduct was illegal." Based on the undisputed facts in the PSI, Martinez's operation appears to have been quite sophisticated and extensive. Not only did she advertise her services, she maintained a log of her customers, prepared leases in their names to establish their Georgia residency and hired two other individuals to help her

drive them to various drivers license service centers around Georgia. Martinez had sources who provided her with birth certificates and social security cards or certified her fraudulent lease agreements. Indeed, the sophisticated manner in which Martinez operated her illegal business is not consistent with the notion that Martinez's criminal conduct was the result of impaired cognitive functioning.

Given the totality of the circumstances, we cannot say the district court abused its discretion by making an 8-month upward variance from the advisory guidelines range of 30 to 37 months and imposing a 45-month sentence.

**AFFIRMED.**