[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13006
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 22, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00038-CR-1-MP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAHMOUD ELDICK,
a.k.a. Mahmoud Aldique,
a.k.a. Abdul Rahman Shatila,
a.k.a. Edward Richard Webber,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(March 22, 2006)**

Before TJOFLAT, ANDERSON and FAY, Circuit Judges.

PER CURIAM:

Mahmoud Eldick appeals his 180-month total sentence, imposed after he pled guilty to one count of healthcare fraud, a violation of 18 U.S.C. § 1347, and and one count of distributing hydrocodone, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)©). On appeal, he argues that the district court was required to impose a sentence within the guidelines range based upon language in his plea agreement, which he entered into prior to the Supreme Court's decisions in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). He further argues that his consecutive statutory sentences on each count were unreasonable in light of Booker. For the reasons set forth more fully below, we affirm.

Eldick was indicted on one count of fraudulently obtaining money from health care programs by filing claims falsely representing that he was a licensed physician in Florida and one count of dispensing hydrocodone. Eldick then pled guilty on June 27, 2003, pursuant to an agreement that provided, inter alia, that "the parties acknowledge that the Sentencing Guidelines apply. The District Court's discretion in sentencing is limited only by statutory provisions and the Sentencing Guidelines." The agreement further provided that "a sentence greater than anticipated shall not be grounds for" withdrawing the plea, and that the court was not limited to facts provided by the defendant or the government. Finally, the

agreement stated that the "defendant understands that any prediction of his sentence by any person is not a guarantee or promise."

At the change of plea hearing, the court explained the elements of the crime, and asked Eldick if he understood that, by pleading guilty, he faced a maximum of 10 years' imprisonment as to Count 1, and 5 years' imprisonment as to Count 2. The court also explained to Eldick that it would be able to determine Eldick's sentence only after the completion of a presentence report and the resolution of any objections thereto. Importantly, Eldick indicated that he understood that, after the district court had determined the applicable guidelines, it still possessed the authority "under certain circumstances" to impose a more or less severe sentence than what the guidelines required.

As part of his plea, Eldick also admitted to a lengthy recitation of facts, which were, in relevant part, as follows. Eldick entered the United States and became naturalized in 1982. On or about June 17, 1987, Eldick was arrested for fraudulently obtaining a Florida drivers license, and several years later, was charged with two felony counts of operating as a pharmacist and dispensing prescriptions without a license. The arrest resulted after Eldick assumed the identity of a deceased pharmacist and informed the Florida Board of Pharmacy that his name had been legally changed to "Magmoud Ehlick." He pled nolo

3

contendere to the charges and received five years probation and a $1,000 fine.

On or about May 26, 1995, a person purporting to be "Abdul Rahman Shatila," applied to the Florida Department of Health for a state medical license, using Shatila's medical credentials, and, upon finding the credentials sufficient, the agency issued a license to Shatila.  Eldick, however, using the name of Shatila, petitioned for a name change to "Mahmoud Aldique," and evidence later showed that Eldick had used the credentials of Shantila to obtain a license in "Aldique's" name.  In 1999, "Doctor Aldique" applied for a position with JFK Medical Center in Atlantis, Florida, and submitted a forged document certifying him as a licensed neurologist. The Department of Health filed an administrative complaint that resulted in a default judgment and fine of $3,535, along with a written reprimand. Aldique's application to JFK hospital had attached to it a photo identified as Eldick (the defendant).

As to the particulars of the instant health care fraud, on August 13, 2001, a form submitted in anticipation of receiving Florida Medicaid payments for medical services rendered was prepared by "Dr. Aldique," doing business as "Community Rural Health, Inc.," and listing "Mahmoud Eldick" as the authorized signatory of the named bank account.  Personnel at Community Rural Health identified "Aldique" as a doctor who provided medical services at two different locations.

4

Aldique and a colleague directed all of their patients to have prescriptions filled at Community Pharmacy, for which Eldick was the sole officer/director. From January 4, 1993, through August 29, 2002, Eldick, posing as Aldique, along with partner Moustafa Eldick and the Community Rural Health Group and Community Pharmacy, billed $5,066,038.81, and were paid $2,715,677.02 by multiple insurers, including Medicare. During the investigation, a videotape recorded Eldick providing medical services and a prescription to a female undercover law enforcement agent. Finally, using the false name and license of Aldique, Eldick obtained permission to distribute controlled substances, and admitted to writing prescriptions for the distribution of hydrocodone.

Eldick's presentence investigation report did not group the two counts of conviction, as they did not involve the same harm. As to Count 1,[1] the base offense level was set at 6, pursuant to § 2B1.1. Based on a loss amount of $1,009,661.62, a 16-level enhancement was added for loss exceeding $1,000,000, under § 2B1.1(b)(1). Next, a four-level enhancement was added because the offense involved 50 or more victims, pursuant to § 2B1.1(b)(2)(B), although the PSI noted that the medical practice operated by Eldick involved approximately

---

[1] Inasmuch as the total offense level is based on the highest between the two counts, and Count 1 was the higher of the two counts, only the calculations as to Count 1 are discussed, with reference to Count 2 where necessary for any adjustments due to the multiple counts.

2,500 patients. A two-level enhancement was then added for conscious or reckless risk of death or serious bodily injury, pursuant to § 2B1.1(b)(2)(B)(11). Finally, a two-level enhancement was added because Eldick had abused a position of trust by posing as a doctor, pursuant to § 3B1.3.

In light of the second Count for dispensing hydrocodone, and taking the highest offense level between the two Counts (Count 1), one additional level was added pursuant to § 3D1.4(a) for multiple counts. Eldick's combined adjusted offense level, therefore, was set at 31. Subtracting three levels for acceptance of responsibility provided for a total offense level of 28. Eldick's criminal history category was set at II. At criminal history category II, and offense level 28, Eldick's guideline range was 87 to 108 months' imprisonment, with a maximum term of imprisonment of 10 years as to Count 1 and 5 years as to Count 2.

The PSI further noted that 851 victims were identified as having suffered losses from Eldick's conduct. Included in the PSI were letters mailed by numerous victims in the case. Some of the more impactful letters are summarized as follows. One victim, writing on behalf of his deceased father-in-law, told the court that Eldick misdiagnosed his father-in-law's cancer, likely resulting in his premature passing because a qualified physician would have caught the cancer in time to treat it. The victim's wife wrote that her father-in-law, after being told that nothing

6

could be done to prolong his life, said "I trusted him" when referring to Eldick, and asked the court, "what price do you put on the loss of a beloved?"

Another victim wrote that she felt violated, as her visit to the defendant included a gynecological exam, and she suffered from mental anguish. Still another victim wrote that Eldick treated her father for a lump on his shoulder, and Eldick attempted to perform surgery to remove the lump, only to cause complications that ultimately led to her father's death. It was her opinion that her father was over-medicated by Eldick to the point that he became incoherent and delirious. Several other letters from the deceased's family expressed the sadness, anguish, and heartfelt loss resulting from his death. The letters continue on for nearly 20 pages, too voluminous to summarize, confirming that Eldick performed unnecessary nerve conduction and electric shock tests, causing a great deal of mental and physical pain to his patients, and indicated that Eldick wrote many unnecessary prescriptions.

The PSI originally stated that the maximum term of imprisonment as to Count 2 was 20 years. The district court's original sentence, based on the PSI, was 120 months on Count 1 and 121 months on Count 2 to run consecutively, which the court recognized was an upward departure from the guidelines, pursuant to 18 U.S.C. § 3584, because the guidelines did not sufficiently take into account the

nature, degree, or harm, both physical and psychological, inflicted by Eldick during his offenses. Eldick appealed, and we remanded the case for resentencing on the basis of the PSI's error concerning the statutory maximum for Count 2, which should have been 5 years. See United States v. Eldick, 393 F.3d 1354, 1354 n.1 (11th Cir. 2004). Eldick's appeal concerns the district court's sentence imposed following the remand.

Prior to Eldick's resentencing in May 2005, the Supreme Court issued its opinion in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), holding that the Federal Sentencing Guidelines, as applied in a mandatory fashion, violated defendants' Sixth Amendment right to a jury, and, therefore, the guidelines were rendered advisory only.

In light of Booker, Eldick filed a sentencing memorandum, arguing that post-Booker, and because he had pled guilty pursuant to an agreement, the district court was required to sentence him within the guideline range of 87 to 108 months. In support, Eldick argued that the plea agreement was a binding contract between the parties, citing United States v. Rubbo, 396 F.3d 1330 (11th Cir. 2005), and that, in any event, the guidelines already provided for the sentence that should be imposed. In short, he argued that the reasons for the district court's departure were already adequately taken into consideration by the guidelines. Finally, he argued

8

that the enhancement for creating a conscious or reckless risk of bodily injury was appropriate, but that a departure based on the same conduct was not.

At his resentencing, Eldick pursued his arguments, noting that the guidelines enhancements increased his base offense level to five times what it otherwise would have been, and, therefore, he argued that the guidelines sufficiently took into consideration the circumstances of the offense. Furthermore, based on the plea agreement, which Eldick argued "recognized that the guidelines would be the controlling factor in this matter," he argued that any previously considered factors were relevant only to determining where, within the guideline range, he should be sentenced.

The government, however, argued that the district court now had discretion to sentence Eldick up to the statutory maximum on each count, with the guidelines being advisory, but not binding if the court believed the guidelines' sentence was not adequate. The government then argued that there had been no changes in the circumstances of either Eldick or his crime between his original sentencing and the present sentencing, and left it to the court to decide what sentence would be adequate.

The court found that it was required to consider the guidelines, but that the guidelines were not binding, and that the guidelines weren't binding pre-<u>Booker</u>

9

either, given that it had the ability to upwardly depart if certain circumstances were present.  The court then found that:

> [I]t was my opinion then and it is my opinion now that the guideline range of 87 to 108 months . . . is wholly inadequate because it fails to grasp the full significance of this defendant's conduct and the harm that he has caused to myriads of persons, psychological injuries included. . . . [T]his defendant has . . . three previous convictions of similar type conduct.  He has never learned, he continues to prey on people, his actions then and now were callous.  They were conscious, they were reckless, they were indifferent to serious bodily injury.  His actions may have caused people that came to him believing he had the knowledge and qualifications and credentials to be a Medical Doctor.  He held himself out as having the ability to make proper medical diagnoses, conducting electric shock therapy, that he had the ability to prescribe medications and conduct surgery.
> We had numerous letters from many victims [describing] the physical and the psychological injuries that they suffered directly related to this defendant's conduct; and the injuries they related and suffered were more serious and more permanent than those resulting from just losing funds to a healthcare fraud scheme. . . . [T]he misdiagnoses and/or the delayed diagnoses as evidence by the care provided to serving defendant's cancer patients may even have contributed to their death.

The court then concluded that, "based on the nature and degree of harm, risk and the number of victims affected in each count, a consecutive sentence continues to be the appropriate disposition of this matter."  Accordingly, the court sentenced Eldick to 120 months' on Count 1, the statutory maximum, to be followed by a 60-month consecutive term, the statutory maximum, on Count 2.  In doing so, the court stated that it had "considered the matters spoken of in the guidelines" and

10

found that "they do not adequately take into account the severity of the damage done by Mr. Eldick and, therefore, I find that they should not be applied." The court noted that Eldick's impersonation of a physician included conducting surgery and gynecological services, and no monetary figure could be applied to the human life that had been affected by his actions. Finally, the court stated that it had considered all of the § 3553(a) factors, including the guidelines and the policy statements of the Sentencing Commission, and felt that the sentence imposed was justified by the nature of the offense and the amount of damages, both quantifiable and unquantifiable.

On appeal, Eldick argues that it was improper for the government to argue that the district court was no longer bound by the guidelines in light of the plea agreement reached between the parties that specifically mentioned that the court would consider the guidelines. He argues that the plea agreement was a contractual agreement, citing Rubbo, and further argues that the grounds for a departure were not met in this case because the guidelines adequately took into consideration the fact that the offense involved a conscious or reckless risk of death or serious bodily harm. Eldick also argues that consecutive sentences of statutory maximums on each count is unreasonable and fails to give any credit to the plea agreement or the binding nature of the guidelines. Finally, Eldick makes a

11

passing reference to <u>North Carolina v. Pearce</u>, 395 U.S. 711, 89 S.Ct. 2089, 23 L.Ed.2d 656 (1969).

To the extent Eldick is arguing that the government breached the plea agreement, we review <u>de novo</u>. <u>United States v. Copeland</u>, 381 F.3d 1101, 1104 (11th Cir. 2004). To the extent Eldick is challenging his overall sentence, we review for reasonableness.[2] <u>United States v. Winingear</u>, 422 F.3d 1241, 1244 (11th Cir. 2005); <u>Booker</u>, 543 U.S. at ___, 125 S.Ct. at 765-66 (holding that appellate courts review sentences for unreasonableness in light of the § 3553(a) factors).

Turning to the plea agreement itself, it is true, as Eldick argues, that plea agreements are "like contracts and should be interpreted in accord with what the parties intended." <u>Rubbo</u>, 396 F.3d at 1334. However, the language of Eldick's plea agreement does not support his argument that the agreement <u>required</u> that the guidelines be applied in a mandatory fashion and a guideline sentence be imposed.

The agreement provides that "the parties acknowledge that the Sentencing

---

[2] Eldick's brief appears to assume that the district court applied an upward departure as it did during his first sentencing. However, the record reveals that the district court, at resentencing, did not treat its decision to sentence Eldick above the guideline range as an upward departure, but rather as an exercise of its discretion because the court did not cite to a specific guidelines departure provision and, in the words of the district court, the guidelines did "not adequately take into account the severity of the damage done by Mr. Eldick, and, therefore, I find that they should not be applied." Therefore, we conclude that we are not reviewing the propriety of a "guidelines" departure.

12

Guidelines apply. The District Court's discretion in sentencing is limited only by statutory provisions and the Sentencing Guidelines." It further provides that the "defendant understands that any prediction of his sentence by any person is not a guarantee or promise." Furthermore, at his plea colloquy, Eldick was made aware and understood that, after the applicable guidelines had been determined, the district court still possessed authority "under certain circumstances" to impose a more or less severe sentence than what the guidelines required. Thus, on its face, the agreement did not require the court to apply the guidelines and Eldick understood that the court could, under the proper circumstances and within statutory provisions and the guidelines themselves, impose a higher sentence than recommended by those guidelines.

Furthermore, when Eldick was resentenced, as was pointed out in our published opinion of his first appeal, Eldick's original sentence was "void in its entirety" and the district court "free to revisit any rulings it made at the initial sentencing." See Eldick, 393 F.3d at 1354 n.1, citing United States v. Yost, 185 F.3d 1178, 1181 (11th Cir.1999). At the time of his resentencing on May 17, 2005, the Supreme Court had issued its ruling in Booker rendering the guidelines advisory only, and, therefore, the district court, while required to consult and properly calculate and apply the guidelines to Eldick's case, was not bound by the

87 to 108 months' imprisonment recommended by those guidelines.  See <u>Booker</u>, 543 U.S. at ___, 125 S.Ct. at 764-65 (excising the mandatory application of the guidelines); <u>United States v. Crawford</u>, 407 F.3d 1174, 1178 (11th Cir. 2005) (holding that, although the guidelines are advisory after <u>Booker</u>, the district court is still bound to consult them and accurately calculate them).

Eldick does not argue that the guidelines were incorrectly calculated, but that the district court was obligated to sentence him to a sentence recommended by the guidelines.  First, nothing in the plea bargain prevented the district court from exercising its discretion under <u>Booker</u>.  Eldick was not promised any particular sentence, and he was aware when he entered his plea that the district court could, in some circumstances, impose a more or less severe sentence than what the guidelines required.  Pre-<u>Booker</u>, the district court could only decide to upwardly depart  within the strictures of the guidelines, while post-<u>Booker</u>, district courts, after calculating the guidelines, are free to impose a more or less severe sentence than the guidelines recommend so long as it is reasonable.  <u>Crawford</u>, 407 F.3d at 1179 (noting that after a district court correctly calculates the guidelines, it "may impose a more severe or more lenient sentence as long as the sentence is reasonable").  Moreover, the government did nothing to breach its agreement with Eldick.  It did not recommend any particular sentence, and, as was the case before

Booker, left the ultimate sentence imposed to the court's discretion.

The district court in this case considered the § 3553(a) factors, including the guidelines and the policy statements of the Sentencing Commission, and found that the guidelines range was "inadequate" because it failed to grasp the full significance and breadth of harm inflicted by Eldick's actions. Of the 851 victims identified by the PSI, several wrote to the court, and these statements demonstrate a degree of widespread physical and mental trauma, including instances where Eldick's actions may have directly or indirectly resulted in a patient's death. The evidence also demonstrated that Eldick profited off of these people by having them purchase prescription medications, often in larger doses than necessary, if necessary at all, from the pharmacy he owned. In light of the district court's statements, echoed by that of some of the victims, that no monetary value could be placed on the human lives affected by Eldick's actions, we conclude that consecutive sentences of 120 and 60 months' imprisonment, the statutory maximums on each Count, respectively, was not an unreasonable sentence in light of the gravity of Eldick's offense. See 18 U.S.C. § 3553(a)(2)(A) (stating that the court should consider the seriousness of the offense when imposing a sentence).

Lastly, Eldick cites to North Carolina v. Pearce, in which the Supreme Court held that when a defendant receives a new trial and is re-convicted, a court cannot

15

impose a more severe sentence than previously received unless the reasons for imposing a more severe sentence appear in the record. 395 U.S. at 725-26, 89 S.Ct. at 2080-81, overruled on other grounds Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). It is clear from the record why the district court sentenced Eldick the way it did, and it was not to be vindictive, but rather because the guidelines did not contemplate the amount of quantifiable and unquantifiable harm caused by Eldick in this case. Accordingly, Pearce has no application here.

In sum, we conclude that nothing in Eldick's plea agreement bound the district court or the government to a mandatory application of the guidelines, the district court correctly calculated the guidelines range, and the court's decision to sentence above that range was supported by the record and did not result in an unreasonable sentence. We, therefore, affirm.

**AFFIRMED.**