[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 1, 2011
JOHN LEY
CLERK

No. 10-11681
Non-Argument Calendar

_____

D.C. Docket No. 1:08-cr-00055-RWS-GGB-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANCISCO CORTES-MEZA,
a.k.a. Paco,
a.k.a. Francisco Cortes Meza,

Defendant-Appellant.

_____

_____

No. 10-12052
Non-Argument Calendar

_____

D.C. Docket No. 1:08-cr-00055-RWS-GGB-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN CORTES-MEZA,
a.k.a. Juan Cortes Meza,

                                        Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(February 1, 2011)

Before BARKETT, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Francisco and Juan Cortes-Meza appeal their sentences of 240 months' and

200 months' imprisonment, respectively, for offenses related to a

human-trafficking and forced-prostitution ring.  Francisco pled guilty to one count

of commercial sex trafficking by force, fraud, or coercion, in violation of 18

U.S.C. § 1591(a) ("Count 7").  Juan pled guilty to one count of sex trafficking of a

child by force, fraud or coercion, in violation of 18 U.S.C. § 1591(a) ("Count 4"),

and one count of importation of an alien for immoral purposes, in violation of 8

U.S.C. § 1328 ("Count 9").  On appeal, Francisco and Juan argue that their

above-guideline sentences constituted upward departures rather than variances,

and, thus, the district court plainly erred in failing to give advance notice of its

2

intent to depart. They further argue that the district court's application of U.S.S.G. §§ 2G1.1(c)(1) and 2A3.1(b)(1) constituted impermissible double-counting, and that the sentence appeal waivers in their plea agreements should be interpreted so as to permit them to appeal this issue. Finally, Juan challenges the substantive reasonableness of his above-guideline sentence. For the reasons set forth below, we affirm Francisco's sentence as to Issue 1, affirm Juan's sentences as to Issues 1 and 3, and dismiss both appeals as to Issue 2.

I.

In 2006, Immigration and Customs Enforcement ("ICE") agents discovered a nationwide network of brothels that brokered Hispanic girls and women for forced prostitution. During the course of the investigation, they determined that Francisco, his uncles Juan and Amador, and three other men were conspiring with each other in an organization in the Atlanta area that participated in human trafficking and forced prostitution of girls and young women from Mexico.

In 2008, agents identified at least 10 victim prostitutes, including 17-year-old LGI, 25-year-old LMJ, and 21-year-old MPM. All of the victims were poor teenagers and young women with limited education who lived in rural areas of Mexico. They reported being enticed by the defendants to travel to the United States under the false pretense of finding legitimate employment and a better way

3

of life. On some occasions, the defendants enticed the victims by acting romantically interested in them or promising marriage. With the help of a "coyote," the defendants would smuggle the women into the United States.

Upon the victims' arrival, the defendants would tell them that they owed money for traveling expenses and would force them into prostitution. The victims were held against their will, intimidated, verbally abused, and sometimes physically assaulted. The defendants isolated the victims and used a combination of smuggling debts, romantic ties, psychological manipulation, false promises, threats, and occasional violence to control and coerce them. They were monitored by the defendants during the day and driven to various dwellings at night in order to engage in prostitution. The victims were prostituted for $25 per 15-minute session. On some nights, the victims were required to service over 20 clients.

In particular, LMJ told investigators that she met Juan and Amador in 2006 in Mexico. The men persuaded LMJ to travel to the United States to obtain work in a restaurant. The men smuggled LMJ into the United States and transported her to Atlanta. On her first night, they informed LMJ that she would be working as a prostitute. When she became upset, they told her that the trip was not free and she would have to work as a prostitute to pay the costs. Amador said that if she refused, he would call her father and tell him that she was working as a prostitute.

4

LMJ lived in various homes with other victims and at least one defendant throughout the period of the offense, including a period during which she stayed with Amador and Juan. At each location, the defendants directed the victims' work and provided them with food and other necessities. She said that she was beaten by the men when she disobeyed or expressed a desire to leave the business. She described the beatings and other physical abuse that were carried out by various defendants against her and the other victims. She feared all of the Cortes-Meza men based on the violence she had witnessed.

Juan met LGI in Mexico in 2008 and began dating her. She told him that she was 17 years old. Soon thereafter, he enticed her to move to the United States under the false pretense that she would be his girlfriend, though he knew that she would be required to engage in prostitution upon her arrival. He smuggled her into the United States, transported her to Georgia, and housed her at several locations. LGI shared a bed with Juan, he told her he loved her, and he paid her living expenses. The next month, he told her that she would be working as a prostitute. His attitude changed and he began mistreating her. She had sex with approximately eight men per night. Juan controlled her daily activities and was physically violent with her. He beat her when she did not comply with his instructions or if she complained about the work.

5

Francisco traveled to Mexico at some point in 2007 and began dating MPM. He eventually told her that he was moving to the United States in order to make more money, and he convinced her to travel with him by telling her that she could earn more money working in a restaurant in the United States. When Francisco met her parents, he told them that he and MPM were going to the United States for employment. They crossed the border illegally and proceeded to Atlanta, with Francisco paying all of their expenses. When they arrived, Francisco took her birth certificate and transported her to one of the housing locations. The next day, he forced her to begin working as a prostitute, servicing eight to ten clients per night. She and the other women in the house were prohibited from going anywhere alone, and they could not open the windows. She had keys to the house but was only permitted to use them when a driver brought her back from work. Francisco slapped her face on multiple occasions, and she became afraid of being beaten.

In 2008, a federal grand jury returned a third superseding indictment, including a total of 34 charges, against Francisco, Juan, Amador, and their 3 codefendants.

## II.

Francisco pled guilty to Count 7, commercial sex trafficking of MPM by

force, fraud, and coercion, in violation of 18 U.S.C. §§ 1591 and 2.  The plea

agreement stated that, "[t]o the maximum extent permitted by federal law,"

Francisco waived the right to appeal or collaterally attack his conviction and

sentence "on any ground, except that [he] may file a direct appeal of an upward

departure or a variance from the otherwise applicable sentencing guideline range."

The agreement further provided that he would be permitted to file a cross-appeal

of his sentence if the government were to initiate a direct appeal.

At the plea colloquy, the district court reviewed the rights to appeal and

collaterally attack a conviction and sentence.  It then asked,

> Do you understand that in this plea agreement you've entered into,
> you have given up those rights and you are not going to have the
> chance for anyone to review what I do in this case except in very
> specific circumstances, and those circumstances are these: You would
> only have a right of appeal if I impose a sentence that is greater than
> 15 years, or, if the government files an appeal.

Francisco said, "Yes," and counsel indicated that they had discussed his appeal

rights and the waiver.

In describing the guideline calculations, the presentencing investigation

report ("PSI") noted that U.S.S.G. § 2G1.1 applied to Count 7.  However, pursuant

to the cross-reference in § 2G1.1(c)(1), the offense level must be calculated

according to U.S.S.G. § 2A3.1 if the offense involved knowingly causing another

7

person to engage in a sexual act by using force against that person or by threatening or placing that person in fear. U.S.S.G. § 2G1.1(c)(1) (citing 18 U.S.C. §§ 2241(a)-(b), 2242). As Francisco's offense involved this type of conduct, the PSI used § 2A3.1 to determine his offense level.

Francisco had a base offense level of 30, pursuant to § 2A3.1(a)(2). Because the offense involved knowingly causing another person to engage in a sexual act by using force against that person or by threatening or placing her in fear that anyone would be subjected to death, serious bodily injury, or kidnapping, as prohibited by § 2241(a) and (b), the four-level enhancement in § 2A3.1(b)(1) applied. With a 2-level vulnerable-victim enhancement and a 3-level reduction for acceptance of responsibility, Francisco had a total offense level of 33. He was subject to a statutory mandatory sentencing range of 15 years' to life imprisonment and, as he was in criminal history category I, a guideline range of 135 to 168 months' imprisonment.

Francisco objected that the correct guideline provision was U.S.S.G. § 2G1.3. The court found that § 2G1.3 applied only to convictions involving minors, and, thus, § 2G1.1 was the correct guideline section. Francisco also objected to the vulnerable-victim enhancement. The court sustained the objection, which reduced his offense level to 31 and his guideline range to 108 to 135

8

months' imprisonment. Nevertheless, he remained subject to the 180-month mandatory-minimum sentence.

The court invited the parties "to discuss any [18 U.S.C. §] 3553 factors that they believe[d] the court should take into account." The government called MPM and another victim to testify that Francisco beat them, lied that they would be working in restaurants in the United States, forced them to be prostitutes, and prohibited them from speaking to anyone. The government and Francisco each suggested that a mandatory-minimum sentence would be reasonable under § 3553(a).

The court acknowledged the mandatory-minimum sentence of 180 months' imprisonment. It stated, "I fully recognize that there was a waiver of appeal rights if I impose that sentence and don't depart upwardly; but in my view, this is a case that warrants a greater sentence than what the mandatory minimum is." The court referenced the nature and circumstances of the offense and the need to reflect the seriousness of the offense as it discussed Francisco's "despicable" conduct, and it noted that it was required to weigh all of the sentencing factors and consider sentencing disparities. It further stated that Francisco's "callous disregard for humanity" raised concerns about the need to protect the public and deter such conduct. The court sentenced Francisco to 240 months' imprisonment,

acknowledging that the sentence was greater than the mandatory-minimum guideline sentence, but "finding that under the [§] 3553 factors, a variance from the guidelines [wa]s appropriate." Francisco objected only to the reasonableness of the sentence.

## III.

Juan pled guilty to Count 4, commercial sex trafficking of the child LGI, in violation of 18 U.S.C. § 1591(a), and Count 9, importation of LMJ for immoral purposes, in violation of 8 U.S.C. § 1328 and 18 U.S.C. § 2. The plea agreement stated that, "[t]o the maximum extent permitted by federal law," Juan waived the right to appeal or collaterally attack his conviction and sentence "on any ground, except that [he] may file a direct appeal (i) of an upward departure or a variance from the otherwise applicable sentencing guideline range, or (ii) if the Court finds an enhancement based on role in the offense pursuant to U.S.S.G. § 3B1.1." The agreement further provided that he would be permitted to file a cross-appeal of his sentence if the government were to initiate a direct appeal.

The PSI noted that U.S.S.G. § 2G1.3 applied to Count 4 and § 2G1.1 applied to Count 9. Section 2G1.3(c)(3), like § 2G1.1(c)(1), states that the offense level must be calculated according to § 2A3.1 if the offense involved knowingly causing another person to engage in a sexual act by using force against that person

or by threatening or placing that person in fear. U.S.S.G. § 2G1.1(c)(3) (citing 18 U.S.C. §§ 2241(a)-(b), 2242). As Juan's offenses involved this type of conduct, the PSI used § 2A3.1 to determine his offense levels for both counts.

Juan had a base offense level of 30 for each count, pursuant to § 2A3.1(a)(2). Because the offenses involved knowingly causing another person to engage in a sexual act by using force against that person or by threatening or placing her in fear that anyone would be subjected to death, serious bodily injury, or kidnapping, as prohibited by § 2241(a) and (b), the four-level enhancement in § 2A3.1(b)(1) applied. The PSI also added a two-level vulnerable-victim enhancement. Thus, both counts were associated with an adjusted offense level of 36. Because the counts were not grouped, a 2-level increase was added, yielding a combined adjusted offense level of 38. With a 3-level reduction for acceptance of responsibility, Juan had a total offense level of 35. Juan was subject to a statutory mandatory sentencing range of 10 years' to life imprisonment for Count 4, a statutory-maximum sentence of 10 years' imprisonment for Count 9, and, as he was in criminal history category I, a guideline range of 168 to 210 months' imprisonment.

At a victim-impact hearing, LGI testified that, when she met Juan, he lied and told her that he sold clothing. She spent about half a year living with him in

11

Mexico, during which time he pretended to be her boyfriend and she became pregnant with his child. When they arrived in the United States and he told her that she would work as a prostitute, she refused, but he hit her. He did not allow her or any of the others to leave the house. When she asked to go home, he told her that she could not. During her pregnancy, the doctors discovered that she had contracted genital herpes.

LMJ testified that Juan and another defendant witnessed Amador beating and humiliating her. She also saw Juan beating and humiliating one of the victims. Juan and one of the other defendants would force her and the others to drink alcohol, and after they were drunk, the men would beat them. She testified that the men had frequently said that, whatever happened, they were going to continue their conduct, because they did not like to work and preferred to "live off of women." She said that she typically had sex with 30 to 35 clients per night, every night of the week. After having sex with so many men in one night, she and the other victims would be in a lot of pain and would say that they were unable to work the next day, but the defendants said that it did not matter and sent them back out to work. If the victims refused, the defendants beat them. She never received medical treatment during the three years she spent with the defendants, including one time that Amador hit her in the head with an iron and the wound

12

took a month to heal.

A victim identified as NHP testified that she once saw Juan hit LGI in the back when she said that she did not want to work. NHP asked Francisco to tell Juan not to hit her, but Francisco hit NHP and told her not to interfere. After that incident, Juan moved LGI to another housing location. When the government asked NHP how it affected her to see Juan hit one of the other victims and make her bleed, NHP responded, "[W]e are human beings; we're not animals. . . . [He] has no right to hit us like that, to beat us." She and other victims also testified about the other defendants' treatment of them, and they mentioned Juan's involvement in monitoring their work and behavior.

Juan raised two objections to the application of § 2A3.1, which he later withdrew. He further objected to the vulnerable-victim enhancement. The court sustained his objection. The court invited the government to speak about the "[18 U.S.C. §] 3553 factors and the appropriate sentence in light of the court's rulings." The government stated that "what happened to [the victims] was horrific." It described Juan's treatment of the victims and argued that a serious sentence was required in order to promote deterrence and "recognize the vast nature of this conspiracy and . . . activity." Pursuant to the plea agreement, it recommended a 150-month sentence.

Juan's counsel agreed with the government's recommended 150-month sentence. In the interest of fairness and appropriately reflecting varying levels of culpability, he noted that Amador and Francisco were more violent and abusive than Juan. He contended that a 150-month, within-guideline sentence would be fair and appropriate.

Juan apologized to the United States and the victims. He acknowledged that the defendants' families had suffered as a result of their behavior and that they depended on the defendants' financial support. He also recognized that the victims had suffered. He asked the court to show mercy to him and his brothers and said,

> [T]hese 23 months that we have been locked up, my brothers and I, we've suffered a lot, the same as the victims are suffering, without having anybody to visit us, without being able to do the commissary. Sometimes you go hungry because as you know, we're not paying our lawyers.

The court noted that § 3553(a) required it to consider the Sentencing Guidelines and several other factors, including the nature and circumstances of the offense. It found that Juan's offense was "outrageous" and "inexcusable." The court had sustained the vulnerable-victim objection in the interest of consistency with the codefendants who had already been sentenced, but Juan had "benefit[t]ed greatly" from that decision, as LGI embodied vulnerability when she testified

14

about what had happened to her. The fact of a grown man enticing a child to leave her family and home to come to the United States "for anything other than the right reasons" was "unexplainable," and for him to have done so in order to prostitute her "exceed[ed] almost the bounds of [the court's] imagination." The court further noted that the victims "were essentially held prisoner" and were subjected to inhumane conditions. The victims were sent into strangers' homes without any protection from the violent situations that might have arisen. LGI would have a disease for the rest of her life. The violence perpetrated by the defendants and the potential violence that could have been perpetrated by the clients placed the victims at substantial risk.

As to Juan's history and characteristics, the court was intrigued by his comments indicating his love and concern for his family. It found that Juan's ability to treat LGI as he had, despite being the father of two daughters himself, reflected a "significant lack of character." The offense presented a need for serious deterrence, and the court worried that Juan had not yet realized what he put the women through. That Juan could suggest that he had suffered much as the victims had suffered was "nothing less than shocking." While acknowledging that jail is "not a nice place," the court spoke at length about the differences between Juan's experience in jail and the conditions the victims had endured. Finally, the

court considered the importance of consistency in sentencing and agreed with counsel that Juan was less culpable than Amador and Francisco.

The court sentenced Juan to 200 months' imprisonment on Count 4, and 120 months' imprisonment on Count 9, to run concurrently. When the court asked whether the defense had any objections, counsel responded that he could not think of any, but later noted, "The court is aware that it's going above the guideline range." The court said that it had considered the guideline range, but that it found that the § 3553 factors warranted an above-guideline sentence.

IV.

As neither Francisco nor Juan objected in the district court to the lack of notice of the above-guideline sentences, we review this issue for plain error. *See United States v. Valentine*, 21 F.3d 395, 398 (11th Cir. 1994) (applying plain error review to court's failure to give notice of departure). Thus, the defendants must show (1) an error that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

A district court is required to give reasonable notice to the defendant when it anticipates departing from the sentencing range on grounds not identified for

departure in the PSI or other presentencing submissions.  Fed.R.Crim.P. 32(h).  In

*Irizarry v. United States* ("*Irizarry II*"), 553 U.S. 708, 716, 128 S.Ct. 2198,

2203-04, 171 L.Ed.2d 28 (2008), the Supreme Court affirmed our holding that the

notice requirement applies only to departures, not to discretionary variances.

In *United States v. Eldick*, 443 F.3d 783, 788 n.2 (11th Cir. 2006), we

concluded that the district court had imposed a variance, rather than a departure,

because the court had not cited to a specific guideline departure provision and had

stated that the guideline range did not adequately account for the severity of the

offense.  In *United States v. Irizarry* ("*Irizarry I*"), 458 F.3d 1208 (11th Cir.

2006), we elaborated on the qualities of a variance:

> We conclude that the above-guidelines sentence imposed by the
> district court in this case was a variance, not a guidelines departure.
> The district court correctly calculated the advisory guidelines range.
> The court then considered the adequacy of this range in the light of
> the sentencing factors listed in 18 U.S.C. section 3553(a) and the
> evidence presented at the sentencing hearing.  After concluding that
> the guidelines range did not adequately address the future risk
> Defendant posed to the public, the court exercised its post-*Booker*[1]
> discretion to impose a reasonable sentence outside the sentencing
> guidelines range.

*Id.* at 1211-12 (citation omitted).

At Francisco's sentencing hearing, the district court calculated the offense

---

[1] *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

level, stated that the guideline sentence was the statutory mandatory minimum, and invited the parties to address the § 3553(a) factors. Both parties suggested that the mandatory-minimum sentence would be reasonable under § 3553(a). The court found that the case warranted a sentence above the mandatory minimum and set forth its reasoning at length, including specific discussion of the nature and circumstances of the offense, the need to reflect the seriousness of the offense, the need to consider sentencing disparities, the need for deterrence, the concern for protection of the public, and the requirement of weighing all of the sentencing factors. The court then announced the sentence and explicitly described it as "a variance from the guidelines" that was appropriate "under the [§] 3553 factors."

At no time did the court cite to a guideline departure provision or indicate that it was following the departure framework in U.S.S.G. Chapter 5. *See Eldick*, 443 F.3d at 788 n.2. The court's isolated statement that "there was a waiver of appeal rights if [it] impose[d] [the guideline] sentence and [did not] depart upwardly" was an offhand, imprecise reference to the terms of the waiver, not a comment on the specific method by which it intended to reach its sentencing determination. In context of the entire record, the district court clearly "exercised its post-*Booker* discretion to impose a reasonable sentence outside the sentencing guideline range" in light of the § 3553(a) factors. *See Irizarry I*, 458 F.3d at

18

1211-12.  Thus, the sentence was a variance.

Similarly, at Juan's sentencing hearing, the court calculated the guideline range, then invited the parties to address the § 3553(a) factors and to suggest an appropriate sentence.  After hearing from the parties, the court described the § 3553(a) requirement of considering the guideline range, the nature and circumstances of the offense, and other factors.  It set forth its reasoning at length, including specific discussion of the nature and circumstances of the offense, the history and characteristics of the defendant, the need for deterrence, and the need for consistency of sentencing among defendants.  After the sentence was announced, the court again stated that the § 3553 factors warranted a sentence above the guideline range.  At no time did it cite to a guideline departure provision or indicate that it was following the departure framework in Chapter 5.  *See Eldick*, 443 F.3d at 788 n.2.  Although the court did not explicitly use the word "variance," the entire record reflects that here, too, it "exercised its post-*Booker* discretion to impose a reasonable sentence outside the sentencing guideline range" in light of the § 3553(a) factors, and, thus, that the sentence constituted a variance. *See Irizarry I*, 458 F.3d at 1211-12.

As both Francisco's and Juan's sentences were variances, they did not trigger the notice requirement in Rule 32(h).  *See Irizarry II*, 553 U.S. at 716, 128

S.Ct. at 2203-04. The court did not err, plainly or otherwise, in failing to give notice of its intent to impose above-guideline sentences.

V.

We review *de novo* the interpretation of an appeal waiver. *See United States v. Bushert*, 997 F.2d 1343, 1352 (11th Cir. 1993) (reviewing *de novo* whether a waiver was made knowingly and voluntarily); *see also United States v. Rubbo*, 396 F.3d 1330, 1332-35 (11th Cir. 2005) (reviewing the interpretation of the terms of an appeal waiver). "Plea bargains . . . are like contracts and should be interpreted in accord with what the parties intended." *Rubbo*, 396 F.3d at 1334. Absent some indication that the parties intended otherwise, the language of the agreement should be given its ordinary and natural meaning. *See id.* at 1334-35. Nevertheless, any ambiguities in the agreement should be resolved in favor of the defendant. *See United States v. Pielago*, 135 F.3d 703, 709-10 (11th Cir. 1998) (stating rule in context of proffer agreements after noting that plea agreements are governed by the same principles).

As the district court lacks the power to modify the terms of a plea agreement or any other contract, it cannot modify or strike a valid appeal waiver by making a statement that could be construed as reinstating the defendant's right to appeal. *United States v. Howle*, 166 F.3d 1166, 1168-69 (11th Cir. 1999) (addressing the

20

district court's statement at sentencing that it encouraged the defendant to appeal a difficult legal issue that had arisen). Such a statement, though potentially confusing to the defendant, is best viewed as dicta that had no effect on the plea agreement. *Id.* at 1168.

Neither Francisco nor Juan argues that their appeal waivers were not made knowingly and voluntarily. Rather, they argue only that they were released from the waivers when the district court varied upward from the guideline range, or that the language of the waiver otherwise permits their appeals of the guideline calculations. Accordingly, they have abandoned any argument that the waivers were not made knowingly or voluntarily. *See United States v. Cunningham*, 161 F.3d 1343, 1344 (11th Cir. 1998) (holding that a defendant abandons a claim when he fails to offer argument on the issue on appeal).

Here, both Francisco and Juan explicitly waived the right to appeal or collaterally attack their convictions and sentences "on any ground, except that [they] may file a direct appeal *of an upward departure or a variance* from the otherwise applicable sentencing guideline range." This language plainly reserves the right to appeal the district court's application of a departure or variance, while waiving all other possible avenues for appealing or collaterally attacking the sentence. Nothing about this language indicates that Francisco or Juan would be

released entirely from the waiver in the event of a variance. Indeed, the agreements explicitly stated the conditions under which they would be released entirely from the waivers, when the agreements specified that the men would be permitted to file cross-appeals if the government were to initiate direct appeals. Furthermore, Juan's waiver explicitly reserved his ability to appeal an aggravating-role enhancement, if one had been applied, thus indicating that he and the government agreed beforehand that particular guideline issues would remain appealable and included those issues in the "except" clause of the waiver.

Thus, the ordinary and natural meaning of the language of the waivers indicates that Francisco and Juan may appeal only the imposition of a variance, not the offense-level calculations. *See Rubbo*, 396 F.3d at 1334-35. Furthermore, the district court's ambiguous statement at Francisco's plea colloquy that Francisco would be able to appeal "if [it] impose[d] a sentence that is greater than 15 years" did not modify the terms of the waiver, *see Howle*, 166 F.3d at 1168-69, and, again, Francisco has abandoned any argument that the court's statement affected the knowing and voluntary nature of the waiver, *see Cunningham*, 161 F.3d at 1344. Finally, as to Juan's argument that the phrase "otherwise applicable sentencing guideline range" is broad enough to permit his appeal, we do not read that provision to mean that, if the district court imposed a departure or variance,

22

Juan was free to appeal any and all aspects of his sentence unrelated to the imposition of a departure or variance.

Accordingly, the sentence-appeal waivers unambiguously prohibit Francisco's and Juan's appeals of Issue 2.

VI.

We review the substantive reasonableness of a sentence under an abuse-of-discretion standard. *United States v. Irey*, 612 F.3d 1160, 1188 (11th Cir. 2010) (*en banc*), *petition for cert. filed*, (Nov. 24, 2010) (No. 10-727). A sentence will be reversed under that standard only if the district court has made a clear error of judgment. *Id.* at 1189. Our review must take into account the totality of the facts and circumstances, including the extent of any variance from the guideline range. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). We will not reverse merely because we believe that a different sentence might have been more appropriate. *Irey*, 612 F.3d at 1191. The appellant bears the burden of establishing that the sentence is unreasonable. *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).

*Booker* requires the district court to consider the factors in § 3553(a) and determine a reasonable sentence. *Id.* at 786. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the

23

defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with training or medical care; (6) the kinds of sentences available; (7) the sentencing guideline range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to the victims. *Id.* (discussing § 3553(a)). The sentence must be no greater than necessary to punish, deter, protect the public, and provide the training and care outlined in the statute. 18 U.S.C. § 3553(a).

The district court commits a clear error of judgment if it weighs the § 3553(a) factors unreasonably, thus arriving at a sentence that does not achieve the statutory purposes of sentencing. *Irey*, 612 F.3d at 1189. The court may also abuse its discretion by failing to consider relevant factors that were due significant weight, or by giving significant weight to an improper or irrelevant factor. *Id.* Nonetheless, a district court does not abuse its discretion when it merely attaches "great weight" to a single, permissible factor or set of factors. *Gall*, 552 U.S. at 56-59, 128 S.Ct. at 600-02.

Juan's 200-month sentence constituted a 19% upward variance from the top end of his advisory guideline range. The district court heard testimony from

several victims and heard argument from the parties about the relative seriousness of Juan's offense. It acknowledged the need to consider the guideline range along with the other sentencing factors in § 3553(a). It discussed LGI's vulnerability, her youth, and the disease she had contracted as a result of the prostitution. The victims were held prisoner in inhumane conditions, sent into strangers' homes without protection from potential violence, and subjected to physical beatings. It described Juan's conduct as "outrageous" and "inexcusable," and said that his own comments at sentencing indicated that he did not understand the seriousness of his offense. The court found that the case presented a serious need for deterrence. The court also weighed all of its concerns against the need for consistency with the sentences that had been imposed on Juan's more-culpable codefendants. Although Juan argues that a 150-month, within-guideline sentence would have been reasonable and sufficient, he has not proved that the district court made a clear error of judgment when it placed additional weight on the nature and circumstances of the offense, the need to reflect the seriousness of the offense, and the need to provide adequate deterrence. *See Irey*, 612 F.3d at 1189. On this record, the district court did not abuse its discretion by applying a 19% upward variance. *See id*. at 1188.

As to the comparative-sentencing examples discussed for the first time in

Juan's initial brief, the only reasonably comparable case is *United States v. Madison*, 477 F.3d 1312 (11th Cir. 2007), in which the defendant pled guilty to sex trafficking of children by force, fraud, or coercion, and was sentenced to 168 months' imprisonment following application of the cross-reference to U.S.S.G. § 2A3.1. *See id.* at 1313-15. As Juan's sentence was only 19% higher than Madison's, and the opinion does not indicate how the *Madison* court weighed the § 3553(a) factors, *see id.* at 1315, *Madison* does not suggest that the district court plainly erred in its review of the sentencing factors in Juan's case. *See United States v. Aguillard*, 217 F.3d 1319, 1320 (11th Cir. 2000) (applying plain error review to sentencing argument raised for first time on appeal).

For the foregoing reasons, we affirm Francisco's sentence as to Issue 1, affirm Juan's sentences as to Issues 1 and 3, and dismiss both appeals as to Issue 2.

**AFFIRMED IN PART AND DISMISSED IN PART.**